IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. 21-00126 JMS<br>CIV. NO. 25-00208 JMS-RT |
| Plaintiff/Respondent, | |
| v. | ORDER (1) DENYING IN PART DEFENDANT/MOVANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE, ECF NO. 166; AND (2) DENYING A CERTIFICATE OF APPEALABILITY AS TO CERTAIN CLAIMS |
| COURTNEY GENE JETER    (01), | |
| Defendant/Movant. | |

**ORDER (1) DENYING IN PART DEFENDANT/MOVANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE, ECF NO. 166; AND (2) DENYING A CERTIFICATE OF APPEALABILITY AS TO CERTAIN CLAIMS**

## I.  INTRODUCTION

On March 30, 2023, Defendant/Movant Courtney Gene Jeter ("Jeter") pled guilty to three counts of a ten-count indictment: *First (Count One)*, conspiracy to distribute and possess with intent to distribute (1) 50 grams or more of methamphetamine, (2) 400 grams or more of a mixture or substance containing fentanyl, (3) 100 grams or more of a mixture of substance containing heroin, and (4) 500 grams or more of a mixture or substance containing cocaine, all in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B) and 846; *second*

*(Count Eight)*, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A); and *third (Count Ten)*, money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  *See* ECF Nos. 87, 89.

On May 13, 2024, the court sentenced Jeter to a total term of 240 months imprisonment, with five years of supervised release.  *See* ECF No. 157. Judgment was entered on May 14, 2024.  ECF No. 158.  Currently before the court is Jeter's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody ("§ 2255 Motion").  ECF No. 166.[1]

Jeter's § 2255 Motion raises many claims challenging his conviction and sentence based on alleged ineffective assistance of his pretrial counsel and separate sentencing counsel.  Specifically, Jeter contends that his pretrial counsel (1) failed to investigate whether the government committed prosecutorial misconduct; (2) failed to communicate and inform him of the circumstances and likely consequences of pleading guilty as opposed to proceeding to trial; (3) failed to conduct an adequate pretrial investigation by not examining his role in the offense and thus did not challenge his leader/organizer enhancement, a stash house enhancement, and a firearms enhancement; and (4) failed to attempt to negotiate a favorable plea agreement.  *Id*. at PageID.1304–1305.  He further alleges that his

---

[1]  All references to the docket refer to Cr. No. 21-00126 JMS(1).

sentencing counsel was ineffective for (1) failing to correctly discuss and explain the presentence report ("PSR"); (2) failing to file substantive objections to the PSR; (3) failing to argue for mitigation of punishment; (4) failing to object to his sentence as substantively unreasonable; and (5) failing to file a notice of appeal. *Id.* at PageID.1306.

As explained to follow, the § 2255 Motion is DENIED as to all the grounds except the last (sentencing counsel allegedly failing to file a notice of appeal after being asked to appeal), which requires further consideration. As to that last ground, the court directs the United States to inform the court by October 14, 2025 whether it (1) seeks an evidentiary hearing, or (2) elects not to oppose the § 2255 Motion and instead permit an appeal. *See United States v. Sandoval-Lopez*, 409 F.3d 1193, 1198 (9th Cir. 2005).

## II. <u>BACKGROUND</u>

### A.    Factual Background

Jeter's conviction pursuant to a plea agreement resulted from an October 7, 2021 indictment charging Jeter and two others (Janet Nelson and David Monalim) for their participation in a drug trafficking conspiracy to possess and distribute methamphetamine, fentanyl, heroin, and cocaine. ECF No. 10. The indictment resulted from a year-long investigation involving the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Honolulu Police

3

Department.  *See* ECF No. 136 at PageID.1026.  In December 2020, a confidential source reported that Jeter was the head of a drug distribution organization.  At the time, Jeter also owned and operated a pawn shop.  *Id.*

During the course of the investigation, authorities obtained court-authorized interceptions of communications between Jeter and others revealing that he was an organizer or leader of a drug trafficking organization, and was storing controlled substances at a "stash house" that he maintained where he distributed controlled substances to sub-distributors and others.  Jeter was also laundering proceeds through his pawn shop.  *See id.* at PageID.1026–1030.

Jeter was arrested on September 30, 2021, *id.* at PageID.1021, and after being advised of his *Miranda* rights, he voluntarily waived his rights and provided statements to investigators admitting to many of the key events in the indictment.  *Id.* at PageID.1029; ECF No. 171-3 at PageID.1449.  Officers executed a search warrant on the stash house on September 30, 2021, and opened a safe (with a code provided by Jeter) that contained numerous controlled substances along with loaded firearms.  ECF No. 136 at PageID.1028–1029.  Near the safe, officials found other drug paraphernalia, assorted ammunition, and a rifle.  *Id.* at PageID.1029.  Also on September 30, 2021, officials executed a search warrant on Jeter's residence, and recovered approximately $50,000 from a safe (again, using a code provided by Jeter).  ECF No. 171-3 at PageID.1449; ECF No. 136 at

PageID.1029.  "Jeter [also] consented to the search of four safe deposit boxes located at a storage facility on Young Street in Honolulu.  He told investigators that they contained approximately $350,000 in cash.  From the safe deposit boxes, investigators recovered $357,900 in cash."  *Id.*

As Jeter's § 2255 Motion acknowledges, ECF No. 166-1 at PageID.1315, the government and Jeter agreed to the following facts in a plea agreement regarding the specific charges to which he pled guilty (and which court repeats here in full):

> a.  By at least January 2018, and continuing to on or about September 30, 2021, within the District of Hawaii and elsewhere, there was an agreement between the defendant, Courtney Gene Jeter (hereinafter "Jeter" or "the defendant"), and others known and unknown, including but not limited to Janet Pauline Nelson and David Abraham Monalim, to possess and distribute controlled substances.

> b.  Jeter was the organizer/leader of the Hawaii based drug trafficking organization.  Jeter had an agreement with individuals known and unknown located in Mexico to supply him with large quantities of controlled substances, including methamphetamine, cocaine, heroin, and knockoff Oxycodone M-30 pills for further distribution in Hawaii.  During the period of the conspiracy, Jeter was supplied with approximately 50 pounds of ICE every six months and he paid $4,000 per pound.  He was also supplied with cocaine, heroin, and knockoff Oxycodone M-30 pills on an as needed basis.  In approximately May 2021, Jeter received a shipment containing 30,000 knockoff Oxycodone pills laced with fentanyl.  After the controlled substances were transported from Mexico into California, Jeter arranged for them to be shipped from California to Hawaii via FedEx or other mail carriers.  Once the

5

controlled substances arrived in Hawaii, Jeter stored them at a residence located on Uahanai Place in Kapolei, Hawaii, hereinafter referred to as the "stash house."  Jeter would then distribute the controlled substances to his sub-distributors, including but not limited to Nelson and Monalim.  After distributing the controlled substances, Nelson, Monalim, and others then provided Jeter with proceeds from the sale of the controlled substances.

c.  Specifically, Jeter had agreements with Nelson, Monalim, and others that he would "front" (provide on consignment) them controlled substances, including methamphetamine, cocaine, and knockoff Oxycodone M-30 pills for them to further distribute to others in Hawaii.  In furtherance of those agreements, Nelson, Monalim, and others distributed the controlled substances and provided Jeter with cash they received from the sale of the controlled substances, keeping any profit for themselves.

d.  Beginning in at least January 2021, and continuing until about September 2021, Jeter fronted Nelson approximately two to three pounds of methamphetamine every two weeks. Nelson in turn distributed the methamphetamine to others in Hawaii and then paid Jeter the proceeds from the sale of the methamphetamine.  During this time period and in furtherance of the conspiracy, Jeter distributed at least 27 pounds of methamphetamine to Nelson for further distribution in Hawaii. Jeter also fronted Nelson other controlled substances for distribution, including cocaine.

e.  When Nelson needed more controlled substances or to provide Jeter with proceeds, Nelson and Jeter would text message or call each other and arrange to "meet up for drinks." "Drinks" was code for drugs or drug proceeds.  For example, on September 14, 2021, Jeter sent Nelson a text message and asked if she wanted to have "drinks" this Friday. Nelson responded in a text message and asked if they were meeting at Hibiscus again.  On September 17, 2021, Nelson met with Jeter and his wife at the Hibiscus Club located on Ward Avenue in Honolulu,

Hawaii and Nelson provided Jeter with proceeds from the sale of controlled substances.

f.  Beginning by at least January 2021, and continuing until about September 2021, at least two to three times a month, Jeter and Monalim met in person at which time Jeter fronted Monalim controlled substances, including methamphetamine, knockoff Oxycodone M-30 pills containing fentanyl, and cocaine.  Monalim in turn distributed the controlled substances to others in Hawaii and then paid Jeter cash proceeds from the sale of the controlled substances.  During this time period and in furtherance of the conspiracy, Jeter distributed at least 45 pounds of methamphetamine to Monalim for further distribution in Hawaii.

g.  When Monalim needed more controlled substances or to provide Jeter with proceeds, Monalim and Jeter would text message or call each other and arrange to meet up. Jeter and Monalim used coded language in these conversations.  They often discussed meeting up for "drinks." "Drinks" was code for drugs or drug proceeds. For example, on July 20, 2021, Monalim called Jeter on his cellular phone.  During the conversation, Jeter asked Monalim if he wanted to "turn up a few and pelt some brews."  Monalim agreed to meet up with Jeter the next day.  On July 21, 2021, law enforcement electronic surveillance showed Jeter entering the stash house and then leaving the stash house carrying a bag with a Nike logo.  Jeter was then seen by law enforcement driving to the Kapolei shopping center where he met with Monalim and gave Monalim the same bag with the Nike logo.  This bag contained controlled substances, which Jeter provided to Monalim for further distribution to others in Hawaii.

h.  During the period of the conspiracy and in furtherance of his drug trafficking, Jeter knowingly and intentionally possessed a Taurus, .38 caliber revolver bearing serial number QF84836, a Ruger, 9MM caliber pistol bearing serial number 313-71342, and 424 rounds of assorted ammunition to include: 403 rounds of 9mm ammunition, 17 rounds of .38 caliber ammunition, 2

rounds of .25 caliber ammunition, and 2 rounds of .22 caliber ammunition. The firearms and ammunition were owned by Jeter and stored by Jeter at the stash house in a safe along with controlled substances. Jeter possessed these firearms and ammunition in furtherance of the charged drug trafficking conspiracy, including for protection against assault, and protection against robbery and theft of his controlled substances and proceeds.

i. On or about September 29, 2021, a federal search warrant was executed at the stash house. The search resulted in the seizure of the above listed firearms and ammunition, as well as the following: 15.52 kilograms (net weight) of pure Methamphetamine Hydrochloride; 1,203 grams (net weight) of Cocaine; 2,922.8 grams (net weight) of Fentanyl (approximately 26,561 pills); 959 grams (net weight) of Heroin; and a scale and other drug paraphernalia. All of the above belonged to Jeter and he knew that the knockoff Oxycodone pills contained Fentanyl. The controlled substances were sent to the Drug Enforcement Administration laboratory for testing and analysis. Lab results confirmed the above net weights and substances.

j. During the period of the conspiracy, Jeter owned and operated a pawn shop in Hawaii, namely, Gold Hawaii Pawn. Jeter laundered his drug proceeds through his business, including but not limited to a $50,000 sham business transaction in or about August 2021, in which he exchanged $50,000 in United States currency for business checks from a precious metals and jewelry store in Honolulu, Hawaii, and then deposited the checks into his various bank accounts. Jeter conducted these financial transactions to conceal and disguise the nature, source, ownership, and control of the proceeds, which he knew were from his illegal drug trafficking.

k. Jeter admits that the approximately $408,919.00 in United States currency seized by the government from his residence and safe deposit boxes and the approximately $261,292.38

8

seized from his personal and business bank accounts are
proceeds of the charged drug trafficking conspiracy.

l.  In furtherance of the charged drug trafficking conspiracy,
Jeter distributed to a confidential informant working for the
Drug Enforcement Administration (DEA) 50 grams or more of
methamphetamine on each of December 17, 2020, January 28,
2021, March 5, 2021, and August 12, 2021.  In exchange for the
methamphetamine received during these four controlled
purchases of methamphetamine from Jeter, the DEA paid Jeter
via the confidential informant $39,000.00 in United States
currency, which Jeter admits are proceeds of the charged drug
trafficking conspiracy.

ECF No. 89 at PageID.367–373.  While under oath at the change-of-plea hearing

the government read that plea-agreement language almost verbatim.  *See* ECF No.

170 at PageID.1370–1375.  Jeter was then asked "do you agree with the

Government summary of what you did?" and he responded "Yes, Your Honor."

*Id.* at PageID.1376.

The plea agreement also contained appeal waivers, including the

following provisions:

a.  The defendant also waives the right to challenge his
conviction or sentence or the manner in which it was
determined in any collateral attack, including, but not
limited to, a motion brought under Title 28, United States
Code, Section 2255, except that the defendant may make
such a challenge (1) as indicated in subparagraph "b"
below, or (2) based on a claim of ineffective assistance of
counsel.

b.  If the Court imposes a sentence greater than specified
in the guideline range determined by the Court to be

> applicable to the defendant, the defendant retains the
> right to appeal the portion of his sentence greater than
> specified in that guideline range and the manner in which
> that portion was determined and to challenge that portion
> of his sentence in a collateral attack.

ECF No. 89 at PageID.377.

## B.    Procedural Background

Jeter was represented by privately-retained counsel William Harrison beginning on October 12, 2021, and privately-retained attorney Myles Breiner substituted as counsel on February 22, 2022.  *See* ECF Nos. 25, 55, 56, 57.  Breiner represented Jeter until January 23, 2023, when he withdrew due to a conflict.  *See* ECF No. 80.  During his representation, Breiner had negotiated a plea agreement with the government, and a change of plea hearing had been set for January 20, 2023.  *See* ECF No. 76; ECF No. 171-1 at PageID.1429–1430.  Given Breiner's withdrawal as counsel, the change of plea hearing did not occur until March 30, 2023.  ECF No. 87.  Jeter retained Gary Singh as counsel after Breiner's withdrawal, and Singh represented him through sentencing and judgment.  ECF No. 80.

On March 30, 2023, Jeter changed his plea to guilty after signing a plea agreement on March 19, 2023.  *See* ECF No. 89 at PageID.393.  The change-of-plea hearing was conducted by Magistrate Judge Wes Reber Porter, who issued a report and recommendation, recommending acceptance of the plea and finding,

among other matters, that Jeter was fully competent to enter the plea, that he

knowingly consented to enter a plea before a Magistrate Judge, that he understood

the nature of the charges and punishments associated with them, and that he

admitted to facts establishing each of the essential elements of Count 1, 8, and 10

of the indictment.  *See* ECF No. 90.  Many of the specific admissions Jeter made

during this change-of-plea hearing are relevant to the ineffectiveness-of-assistance

claims Jeter now makes, and those specific admissions are discussed in more detail

to follow.

   The court accepted the guilty plea on April 17, 2023.  ECF No. 94.

And on May 13, 2024, the court sentenced Jeter to a total of 240 months

incarceration, with a sentence of 180 months for Counts 1 and 10 to run

concurrently, and a 60-month sentence for Count 8 to run consecutively.  *See* ECF

No. 157, 158.  The court accepted the Plea Agreement which had been filed on

March 31, 2023.  ECF No. 157.  The relevant details of the sentence are discussed

to follow, as Jeter challenges specific enhancements and sentencing guidelines

matters which he claims that counsel should have considered when representing

him.  Jeter, represented by his current counsel (D. Craig Hughes), filed his § 2255

Motion on May 21, 2025, along with a memorandum in support.  *See* ECF Nos.

166, 166-1.[2]  The Motion is timely under 28 U.S.C. § 2255(f) because he filed it

within one year from the date his conviction became final (i.e., May 28, 2024,

which is 14 days after judgment was entered against him on May 14, 2024).  *See*

28 U.S.C. § 2255(f)(1).  The government filed its Response and supporting

documents on July 1, 2025.  *See* ECF Nos. 171, 171-1 to 171-11.  Jeter filed a

Reply and supporting documents on August 21, 22, and 27, 2025.  *See* ECF Nos.

174 to 177.[3]

## III.  **STANDARD OF REVIEW**

The court's review is governed by 28 U.S.C. § 2255(a), which

provides:

> A prisoner in custody under sentence of a court
> established by Act of Congress claiming the right to be
> released upon the ground that the sentence was imposed
> in violation of the Constitution or laws of the United
> States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess
> of the maximum authorized by law, or is otherwise

---

[2]  Jeter filed an initial § 2255 Motion on May 20, 2025, ECF No. 164, but re-filed the Motion on May 21, 2025, ECF No. 166, to correct a CM/ECF filing error.  To avoid administrative confusion, the court terminated the initial motion (ECF No. 164) such that the operative § 2255 Motion is ECF No. 166.  *See* ECF No. 167.

[3]  Jeter's § 2255 Motion was filed and signed by counsel but was not signed by Jeter himself.  *See* ECF No. 166 at PageID.1312.  The Motion itself was not supported by any evidence.  *See* ECF No. 173.  Although Jeter mentions that his Motion was "verified," ECF No. 175 at PageID.1499, it was not actually verified by him.  In reply, however, Jeter submitted a declaration under penalty of perjury attesting to certain non-specific allegations in the Motion.  *See* ECF No. 174.  He also submitted a sworn declaration from his wife, Andrea Jeter, attesting to certain facts regarding the failure to file a notice of appeal.  *See* ECF No. 177.

subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A court may deny a § 2255 motion if "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." R. 4(b) Governing § 2255 Proceedings in the U.S. Dist. Cts. A court need not hold an evidentiary hearing if the allegations are "palpably incredible" or "patently frivolous or false" or if the issues can be conclusively decided based on the evidence in the record. *Blackledge v. Allison*, 431 U.S. 63, 76 (1977) (internal quotation marks and citation omitted); *see also United States v. Mejia-Mesa*, 153 F.3d 925, 929 (9th Cir. 1998) (explaining that a "district court has discretion to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief"); *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988) (explaining that no hearing is required when the petitioner's credibility can be "conclusively decided on the basis of documentary testimony and evidence in the record.").

Conclusory statements in a § 2255 motion are insufficient to require a hearing. *See United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993). Rather, a petitioner must allege specific facts that, if true, would entitle the petitioner to relief. *See United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (citing *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996)). In addition,

judges may supplement the record with their own notes and recollections of the plea hearing and sentencing process, and "may also use common sense." *Shah v. United States*, 878 F.2d 1156, 1159 (9th Cir. 1989) (citations omitted).

## IV. <u>DISCUSSION</u>

As set forth above, Jeter's § 2255 Motion raises claims of ineffective assistance of counsel, arguing that his pretrial counsel:[4] (1) failed to investigate whether the government committed prosecutorial misconduct; (2) failed to communicate and inform him of the circumstances and likely consequences of pleading guilty as opposed to proceeding to trial; (3) failed to conduct an adequate pretrial investigation by not examining his role in the offense and thus did not challenge his leader/organizer enhancement, a stash house enhancement, and a firearms enhancement; and (4) failed to attempt to negotiate a favorable plea agreement. ECF No. 166 at PageID.1304–1305. Jeter also alleges that his sentencing counsel (Singh): (1) failed to correctly discuss and explain the PSR; (2) failed to file substantive objections to the PSR; (3) failed to argue for mitigation of punishment; (4) failed to object to his sentence as substantively

---

[4] Although Jeter directs these arguments at "pretrial counsel," in this regard he sometimes challenges acts or omissions of both Breiner and Singh (who represented Jeter at the change of plea and at sentencing). *See, e.g.*, ECF No. 166-1 at PageID.1330 ("Both Breiner and Singh failed to investigate Jeter's actual role in the alleged drug conspiracy."). As examined to follow, the "pretrial" claims fail regardless of which counsel might have been responsible.

14

unreasonable; and (5) failed to file a notice of appeal.  *Id.* at PageID.1306.  The court addresses each ground in turn, after setting forth applicable standards for examining claims for ineffective assistance of counsel.

## A.    Legal Standards for Ineffective Assistance of Counsel Claims

### *1.    General Standards*

The Sixth Amendment guarantees the right to effective assistance of counsel at all critical stages of a criminal proceeding, including sentencing.  *See, e.g.*, *United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997).  To prevail on an ineffective assistance claim, a petitioner must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  That is, the petitioner must show that a deficiency was prejudicial.  *Id.* at 692.  "[I]t is unnecessary to consider the prejudice prong of *Strickland* if the petitioner cannot even establish incompetence under the first prong."  *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998) (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995)).  Likewise, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  *See Strickland*, 466 U.S. at 697.  In other words, any deficiency that does not result in prejudice necessarily

fails.  A defendant has the burden of proof as to both *Strickland* prongs.  *See, e.g.*, *Turk v. White*, 116 F.3d 1264, 1265 (9th Cir. 1997); *United States v. Gordon*, ___ F.4th ___, 2025 WL 2396497, at *5 (9th Cir. Aug. 19, 2025).

Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Courts "assess a particular decision not to investigate or to limit the scope of investigation for reasonableness." *Waidla v. Davis*, 68 F.4th 575, 585 (9th Cir. 2023).  "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary." *Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1988).  Thus, "[i]n assessing the reasonableness of an attorney's investigation

16

. . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see also White v. Ryan*, 895 F.3d 641, 670 (9th Cir. 2018).

Conclusory allegations of ineffective assistance of counsel made with no factual or legal explanation fall well short of stating a cognizable claim for ineffective assistance of counsel. *See Blackledge*, 431 U.S. at 74 ("[P]resentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . ."); *see also Clark v. Broomfield*, 83 F.4th 1141, 1148 (9th Cir. 2023 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.") (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).

### 2.    *Guilty Pleas and Plea Bargaining*

Generally, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984), *overruled in part on other grounds by Puckett v. United States*, 556 U.S. 129 (2009).

> When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the

17

> guilty plea.  He may only attack the voluntary and
> intelligent character of the guilty plea by showing that the
> advice he received from counsel was [ineffective].

*Tollett v. Henderson*, 411 U.S. 258, 267 (1973).  "[T]he negotiation of a plea

bargain is a critical phase of litigation for purposes of the Sixth Amendment right

to effective assistance of counsel."  *Missouri v. Frye*, 566 U.S. 134, 141 (2012)

(quotation marks omitted) (quoting *Padilla v. Kentucky*, 556 U.S. 356, 373

(2010)).  "During plea negotiations defendants are entitled to the effective

assistance of competent counsel."  *Lafler v. Cooper*, 566 U.S. 156, 162 (2012)

(internal quotation marks and citation omitted).  Thus, "[t]he *Strickland* test applies

to challenges to guilty pleas based on ineffective assistance of counsel."

*Cabinatan v. United States*, 2011 WL 255691, at *3 (D. Haw. Jan. 26, 2011)

(citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).

　　　　Where a petitioner has pled guilty and is asserting ineffective

assistance of counsel, *Strickland's* prejudice requirement focuses on whether

counsel's constitutionally ineffective performance affected the outcome of the plea

process.  "In cases where a defendant complains that ineffective assistance led him

to accept a plea offer as opposed to proceeding to trial, the defendant will have to

show 'a reasonable probability that, but for counsel's errors, he would not have

pleaded guilty and would have insisted on going to trial.'"  *Frye*, 566 U.S. at 148

(quoting *Hill*, 474 U.S. at 59).  And in guilty plea cases, where counsel's alleged

ineffective assistance is a failure to investigate, "the determination of whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change [the] recommendation as to the plea." *Hill*, 474 U.S. at 59.

Moreover, "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for the attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369 (2017). "Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id.* "[T]o determine whether a defendant would have gone to trial in the hypothetical scenario where his attorney had provided competent advice, [courts] are limited to evidence contemporaneous to the guilty plea." *United States v. Rodriguez*, 49 F.4th 1205, 1214 (9th Cir. 2022).

## B. Application to Jeter's Claims of Ineffective Assistance

### 1. Pretrial Counsel's Failure to Investigate Prosecutorial Misconduct

Jeter first contends that his pretrial counsel was ineffective for failing to investigate prosecutorial misconduct, namely, concerns that (1) the government entrapped him (i.e., "induced Jeter to engage in criminal conduct he was not predisposed to commit," ECF No. 166-1 at PageID.1324), and (2) "knowingly present[ed] false or misleading testimony and fail[ed] to disclose exculpatory

evidence about Lynch's true role." *Id.*[5]  These claims appear to be fabricated from whole cloth; they lack any factual basis and are contradicted by Jeter's own admissions.

Initially, Jeter's § 2255 motion argues that he "constantly and specifically requested" that his pretrial counsel investigate such misconduct.  *Id.* at PageID.1325.  But he has no evidence of this.  In this regard, his own declaration attests only generally that "[p]retrial counsel failed to investigate whether the Government engaged in prosecutorial misconduct in my case."  ECF No. 174 at PageID.1496.  He simply attests that "[c]ounsel did not examine or challenge any conduct by the prosecution that may have improperly influenced my decision to plead guilty, the presentation of evidence, or the plea negotiation process."  *Id.* Nowhere does he attest that he asked counsel to investigate entrapment, the role of a confidential informant, or any government evidence about "Lynch's true role."  Similarly, Jeter's Reply argues that "Jeter specifically asked Breiner to investigate [the roles of Lynch and Tellis] and even offered to pay for a private investigator."  ECF No. 175 at PageI.1501.  For this proposition, the Reply cites only "Gov't

---

[5]  As explained to follow, "Lynch" refers to Jeff Lynch, who was located in Mexico.  Jeter told authorities that his son-in-law, Lamonte Tellis, had introduced Jeter to Lynch while in Mexico.  ECF No. 171-4 at PageID.1457.  Lynch (who spoke Spanish fluently) then introduced Jeter to "Oscar" and others who supplied drugs to Jeter.  *Id.*  "Jeter negotiated amounts and prices for ICE and cocaine with OSCAR."  *Id.*; *see also* ECF No. 171-3 at PageID.1450.  These events occurred in 2017, according to Jeter's statements.

Resp. at 24 ¶ 2." *Id.* But the second paragraph of page 24 of the government's Response is not evidence, and it says exactly the *opposite*: "[Breiner] states that Jeter never raised concerns that Tellis or Lynch were government agents who had entrapped him." ECF No. 171 at PageID.1412 (citing Breiner's Declaration).

And as the government points out, Breiner indeed submitted a declaration under oath attesting:

> Jeter never raised any concerns with me that Jeff Lynch or Lamont Tellis were government agents, nor was there any evidence indicating that they were. To the contrary, Jeter disclosed that Lamont Tellis was his son-in-law and that Tellis lived with Jeter's daughter in Mazatalan, Mexico. Jeter further disclosed that while visiting his daughter and son-in-law in Mexico, Tellis introduced Jeter to Jeff Lynch and that Lynch introduced him to the individuals that began supplying him with the controlled substances. It was my understanding that Jeter told this to law enforcement at the time of his arrest as well. Jeter never related to me that he believed there was misconduct by the government relating to Lynch and Tellis, nor did he request that any such "issues" be investigated.

ECF No. 171-1 at PageID.1428. Jeter's Reply also incorrectly argues that "Breiner's declaration denying [that Jeter asked Breiner to investigate] is contradicted by Jeter's sworn declaration, contemporaneous proffer notes, and Breiner's own entrapment letter (see entrapment letter)." ECF No. 175 at PageID.1501. But Jeter has no such statement in his sworn declaration. Nor does

Jeter provide any copies or evidence of Breiner's "contemporaneous proffer notes" or an "entrapment letter," much less explain what such documents might provide.

Moreover, Jeter's theory about entrapment makes no sense, and is inconsistent with the record. Jeter's § 2255 Motion argues:

> From the outset, the government's confidential informant, Jeff Lynch ("Lynch")—acting as a de facto government agent— and who was introduced to Jeter by Lamont Tellis ("Tellis"), initiated contact with Jeter, provided him drugs without prepayment, and directed him on how to distribute and remit proceeds. These transactions were filmed, controlled, and confirmed by federal law enforcement.

ECF No. 166-1 at PageID.1324. But these events occurred in approximately 2017—well before the government's investigation even began—according to Jeter's own volunteered statements to authorities made after his arrest in 2021. *See* ECF No. 171-3 at PageID.1450; ECF No. 171-4 at PageID.1457.[6] None of these dealings was "filmed, controlled and confirmed by federal law enforcement." As Breiner attests, Jeter himself told the government about Lynch and Tellis and their suppliers in Mexico. *See* ECF No. 171-1 at PageID.1428.

There *were* transactions with a confidential informant in 2021 (as Jeter's memorandum later acknowledges, *see* ECF No. 166-1 at PageID.1330), but

---

[6] The government thus argues that "[n]either Tellis nor Lynch were government cooperators" and points out that there is no evidence that Lynch was operating under FBI authority. ECF No. 171 at PageID.1411.

the informant's identity was known to Jeter and available in discovery. There is no

indication of any prosecutorial misconduct for Breiner to have investigated as to

Lynch's role, much less the role of the actual informant. *See* ECF No. 171 at

PageID.1412; ECF No. 171-1 at PageID.1428–1429. Jeter has thus not shown that

Breiner was ineffective for failing to investigate entrapment.

      Jeter's § 2255 Motion attempts to make much of redactions of Lynch's

(and others') names in a DEA Form 6 that memorializes Jeter's statements made

on September 30, 2021. *See* ECF No. 171-3 at PageID.1450. Jeter argues that the

government failed to disclose exculpatory evidence "about Lynch's true role," and

that "the redaction of Jeter's post-arrest statement to remove references to Lynch

suggests an intent to mislead the court and jury." ECF No. 166-1 at PageID.1324;

*see also* ECF No. 175 at PageID.1501 (arguing in reply that "DEA-6 forms appear

redacted to substitute "Oscar" for "Lynch," raising serious *Brady* concerns").[7] But

---

[7] Jeter's Reply argues that "[t]he Government's attempt to attribute the supplier role to a non-English-speaking 'Oscar' is implausible. . . . Instead, discovery discs show money drops orchestrated by Lynch." ECF No. 175 at PageID.1501 (citing "Disc C, p. 4 of 11, Jeter 000044-45, 000068-73, Ex. 2, no. 14)"). This cryptic reference to evidence, however, is unavailing. Jeter did not provide the information to the court in his filings, and did not cite to anything else in the record (and criminal discovery is not normally provided to the court). These references thus do not support Jeter's theory of ineffective assistance for prosecutorial misconduct.

    To the extent Jeter implies that he should be entitled to discovery under Rule 6 of the Supplemental Rules Governing Section 2255 Proceedings, "courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. U.S. Dist. Ct. for the N. Dist. of Calif.*, 98 F.3d 1102, 1106 (9th Cir. 1996) (citations omitted). "Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence." *Id.* (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

(1) such redactions are common during an investigation phase, (2) the names and roles were disclosed by the government and were known to Jeter and Breiner (having been provided by Jeter himself),[8] and (3) the forms were never provided to the court (until the government filed them in these § 2255 proceedings) or to a jury—because there was no trial.

In short, as to this ground, Jeter has not demonstrated that Breiner's representation fell below an objective standard of reasonableness, much less that there is a reasonable probability of prejudice. *See Strickland*, 466 U.S. at 687–88. This conclusion is easily made based on the existing record, without the need for an evidentiary hearing. *See, e.g.*, *Mejia-Mesa*, 153 F.3d at 929 (explaining that a "district court has discretion to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief").

### 2. *Alleged Failure to Communicate Regarding the Consequences of Pleading Guilty*

Jeter argues that neither Breiner nor Singh "meaningfully consulted with Jeter about possible defenses, trial strategies, or the consequences of accepting or rejecting the government's plea offer." ECF No. 166-1 at

---

[8] *See* ECF No.171-1 at PageID.1428 (Breiner decl.); ECF No. 171-4 at PageID.1457 (partially unredacted notes from Jeter's proffer interview of November 30, 2021).

PageID.1327.  He also argues that "Singh did not discuss with Jeter any potential avenues of defense, the strength of the government's evidence, the possibility of proceeding to trial, or the risk-benefit analysis associated with pleading guilty." *Id.*

The claim plainly fails.  Initially, the only *evidence* Jeter proffers for this claim is his declaration stating that his pretrial counsel failed to "[c]ommunicate with me and inform me of the relevant circumstances and likely consequences of pleading guilty and proceeding to trial."  ECF No. 174 at PageID.1496.  He does not, however, attest that he would have insisted on going to trial if he knew of any particular facts or law, nor does he identify any specific advice he was given by either counsel that was incorrect and that led him to plead guilty rather than proceed to trial.  Jeter's conclusory affidavit is insufficient.  *See, e.g.*, *Blackledge*, 431 U.S. at 74 (observing that "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal").

In contrast, both Breiner and Singh proffer detailed declarations attesting that they had ample communications with Jeter on the consequences of pleading guilty and foregoing a right to trial.  Breiner attests that he "communicated with and advised Jeter extensively about the strength of the government's evidence, his right to proceed to trial, and the risks and benefits associated with proceeding to trial versus pleading guilty."  ECF No. 171-1 at PageID.1429.  "This discussion included reviewing the discovery/evidence and

25

advising Jeter of the drug, firearm and money laundering charges and the penalties he faced for each charge." *Id.* Breiner explains under oath that when he began representing Jeter, Jeter had "already made significant post-*Miranda* admissions of guilt," *id.* at PageID.1427, and that "from the beginning of [his] representation of Jeter and following in depth discussions with him, it was clear to [him] that [Jeter] had decided to take full responsibility for his conduct and had no desire to proceed to trial." *Id.* The "focus turned to Jeter's ability to cooperate with the government and provide substantial assistance in an attempt to receive a 5K motion, in negotiating a plea, and on gathering and presenting mitigating evidence of sentencing purposes." *Id.*[9]

Similarly, Singh attests that he did not begin representing Jeter until January 2023, after Jeter had already signed a plea agreement with the government (when Breiner was still representing Jeter). *See* ECF No. 171-2 at PageID.1440. Singh further explains that he had in depth discussions with Jeter about admissions he had made following his arrest, and that he explained the strength of the government's case, the charges in the indictment, along with Jeter's right to

---

[9] Breiner's declaration is supported by contemporaneous emails of plea negotiations between Jeter and the government in which Breiner states "[w]e want to be unequivocally clear; Mr. Jeter intends to plead guilty pursuant to the [plea agreement]." ECF No. 171-6 at PageID.1466. *See also* ECF No. 171-7 at PageID.1470 ("Pending our resolution of the factual stipulation in the [plea agreement], Mr. Jeter intends to plead guilty and continue cooperating with the Government.").

proceed to trial. *Id.* at PageID.1442. "Jeter conveyed to [Singh] that he

understood the charges and the evidence and did not wish to contest it." *Id.*

> Specifically as to the plea agreement, Singh declares:

> I provided Jeter with a copy of the government's formal plea offer (Memorandum of Plea Agreement, "MOPA") and requested that he read it personally. I then met with Jeter and went over the MOPA in detail with him. I advised Jeter of the penalties he faced for each charge, as well as the elements that the government would be required to prove if the case went to trial. I also discussed the stipulations relating to the leader/organizer and stash house enhancements. I discussed the rights Jeter would be giving up by pleading guilty including his right to appeal. I further discussed the United States Sentencing Guidelines with Jeter and advised him of how the Guidelines might apply to his case, which included my estimate of the Guideline range he was likely facing as a result of the drug weight and enhancements for leader/organizer and for operating a stash house. . . . Following our discussions, Jeter had no further questions and signed the MOPA.

*Id.* at PageID.1443.[10]

> And at the change-of-plea hearing, Jeter affirmed under oath, among

other facts, that (1) no one had made promises or threats to him to plead

---

[10]  The plea agreement was filed on March 31, 2023, ECF No. 89, with Jeter and Singh signing on March 19, 2023. *Id.* at PageID.393. The court infers that Singh signed a final version of the plea agreement given his substitution as counsel after Breiner's withdrawal as counsel on January 20, 2023, *see* ECF No. 79, where Breiner had signed a prior version of a plea agreement. *See* ECF No. 171 at PageID.1395 ("Jeter and Mr. Breiner signed at least two Memorandum of Plea Agreements, the final one of which was provided to the government on January 11, 2023. . . .").

guilty (other than promises set forth in the plea agreement), (2) he had a sufficient

opportunity to discuss his case with counsel, (3) he was satisfied with advice

counsel had given him, (4) he had reviewed the indictment and had discussed the

evidence and charges with his counsel, (5) he understood the elements of the

charges and the range of possible penalties, (6) he understood the rights he was

giving up by pleading guilty, and (7) he had read and discussed the plea agreement

with counsel before he signed it.  *See* ECF No. 171-10 at PageID.1477–1486.  He

then admitted under oath, and in his own words, to the specific facts of the drug,

firearm possession, and money laundering counts in the indictment.  *Id.* at

PageID.1487–1489.[11]

       These under-oath statements fatally undermine Jeter's claims that

counsel did not communicate with him as to the consequences of pleading guilty

versus proceeding to trial.  *See Blackledge*, 431 U.S. at 74 ("Solemn declarations in

open court carry a strong presumption of verity.  The subsequent presentation of

conclusory allegations unsupported by specifics is subject to summary dismissal,

as are contentions that in the face of the record are wholly incredible."); *United*

*States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) ("Statements made by a

---

[11]  At sentencing, Jeter acknowledged and thanked both Singh and Breiner, telling them on the record: "Gary, Myles, I appreciate you guys putting up with me, keeping me calm, and going beyond your professional capacity to keep me focused and informed on this ordeal.  I really appreciate it."  ECF No. 161 at PageID.1213–1214.

defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea."); *United States v. White*, 366 F.3d 291, 297 (4th Cir. 2004) ("[A] court can summarily dismiss allegations of a petitioner who attempts to challenge statements made during a plea colloquy or in his plea agreement. . . .").  The Ninth Circuit has held that a collateral challenge based on allegations that contradict a defendant's sworn statements lacks merit.  *See Muth v. Fondren*, 676 F.3d 815, 821–22 (9th Cir. 2012) (rejecting a defendant's challenge to his guilty plea that was contradicted by his sworn statements during the change of plea hearing) (collecting cases).

In short, the record conclusively establishes that Jeter has failed to show ineffective assistance regarding his guilty plea, much less "a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Frye*, 566 U.S. at 148 (quotation marks omitted).  And, although Jeter has not attested that he would have insisted on proceeding to trial, even if he had, there is no "contemporaneous evidence to substantiate" such an assertion.  *Lee*, 582 U.S. at 369; *see also Rodriguez*, 49 F.4th at 1214 ("[T]o determine whether a defendant would have gone to trial in the hypothetical scenario where his attorney had provided competent advice, we are limited to evidence contemporaneous to the guilty plea.").  No evidentiary hearing is necessary on this question.  *See, e.g.*, *Mejia-Mesa*, 153 F.3d at 929 (explaining that

a "district court has discretion to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief").

### 3. *Pretrial Counsel's Failure to Conduct an Adequate and Independent Pretrial Investigation*

Next, as summarized earlier, the § 2255 Motion challenges counsel's investigations regarding a leader/organizer enhancement, a stash house enhancement, the firearm charge, and a failure to negotiate a favorable plea agreement. *See* ECF No. 166 at PageID.1329–1332. In support of these claims, Jeter attests generally that his pretrial counsel failed to:

> [c]onduct an adequate and independent pretrial investigation, including but not limited to:
>
> [a.] Failing to investigate and challenge my alleged role as a leader or organizer, which resulted in an unwarranted enhancement under the Sentencing Guidelines;
>
> [b.] Failing to contest the application of the stash house enhancement under U.S.S.G. § 2Dl.l(b)(12), despite insufficient evidence that the premises were maintained for drug distribution purposes;
>
> [c.] Failing to challenge the firearm enhancement under U.S.S.G. § 2Dl.l(b)(18) in connection with the 18 U.S.C. § 924( c) charge, despite factual and legal grounds to contest whether the firearm was possessed or used in furtherance of a drug trafficking crime; and

> [d.]  [Failing to] [a]ttempt to negotiate a favorable plea agreement on my behalf, which deprived me of the opportunity to secure a lesser sentence or more favorable terms.

ECF No. 174 at PageID.1496.  All these grounds fail.

### a.    Leader or organizer enhancement

Jeter simply states, without specifics, that counsel (whether Breiner or Singh) failed to investigate or challenge the 4-level enhancement for his leadership role in the offense.  *See* ECF No. 166-1 at PageID.1330.  But Breiner attests that Jeter—after reviewing the strength of the government's evidence and Jeter's unprotected admissions to the FBI—"ultimately decided that he did not wish to contest these [enhancement] issues."  ECF No. 171-1 at PageID.1430.  And, indeed, Jeter admitted and stipulated in writing in his plea agreement that "Jeter was the organizer/leader of the Hawaii based drug trafficking organization."  ECF No. 89 at PageID.368.

Similarly, Singh attests that when he met with Jeter regarding the plea agreement, he "also discussed the stipulations relating to the leader/organizer and stash house enhancements."  ECF No. 171-2 at PageID.1443.  He "further discussed the [Guidelines] with Jeter and advised him of how the Guidelines might apply to his case, which included [Singh's] estimate of the Guideline range he was likely facing as a result of the . . . enhancements for leader/organizer and for

operating a stash house." *Id.*  Again, after discussing the plea agreement, "Jeter had no further questions and signed the [plea agreement]." *Id.*

And during the change-of-plea hearing, Jeter affirmed under oath that he read and understood the plea agreement, and that he had discussed it with counsel before signing it. *See* ECF No. 171-10 at PageID.1484.  He agreed that no one made any threats or promises related to the plea agreement. *See id.* at PageID.1485.  During that hearing, the government summarized that "Jeter was the organizer and leader of the Hawaii based drug trafficking organization [and] had an agreement with individuals known and unknown located in Mexico to supply him with large quantities of controlled substances, including methamphetamine, cocaine, heroin and knockoff Oxycodone M-30 pills for further distribution in Hawaii."  ECF No. 170 at PageID.1370.  Jeter told the court under oath that he agreed with the government's summary. *Id.* at PageID.1376.

Again, these admissions at his plea hearing fatally undermine Jeter's claims that counsel was ineffective for "[f]ailing to investigate and challenge [his] alleged role as a leader or organizer."  ECF No. 174 at PageID.1496.  There was no "unwarranted enhancement under the Sentencing Guidelines." *Id.  See Blackledge*, 431 U.S. at 65; *Ross*, 511 F.3d at 1236; *White*, 366 F.3d at 297; and *Muth*, 676 F.3d at 821–22 (agreeing with "[o]ther circuits [that] have confronted the question whether a petitioner may rest a collateral challenge on allegations that directly

32

contradict the petitioner's [sworn] statements [during plea proceedings] and have

held that, ordinarily, such petitions must fail") (citations omitted).[12]  Given the

record, no evidentiary hearing is necessary on this question because "the files and

records conclusively show that [Jeter] is not entitled to relief." *Mejia-Mesa*, 153

F.3d at 929 ("[A] district court has discretion to deny an evidentiary hearing on a

§ 2255 claim where the files and records conclusively show that the movant is not

entitled to relief.").

> b.    *Stash house enhancement*

Similarly, Jeter argues that counsel was ineffective by failing to

challenge the "stash house" enhancement—i.e., U.S.S.G. § 2D1.1(b)(12) for

maintaining a premises for the purpose of distributing controlled substances—

"even though the evidence indicates otherwise."  ECF No. 166-1 at PageID.1330.

He argues that "Jeter's use of the garage [for drug activities] was incidental rather

than primary." *Id.*[13]

---

[12]  As stated by the court at sentencing, the 4-level role in the offense adjustment "is more than justified in this case."  ECF No. 161 at PageID.1236.  Any objection to the application of this enhancement would have clearly failed, and this failure to object could not be prejudicial.

[13]  The Motion argues (misleadingly) that "[t]his enhancement applies only when a location is primarily used for manufacturing or distributing controlled substances."  ECF No. 166-1 at PageID.1334–1335 (citing *United States v. Miller*, 698 F.3d 699, 705 (8th Cir. 2012)).  But *Miller* did not state such a general rule; *Miller* applied factors to determine whether a *defendant* "maintained" premises for drug distribution.  *Id.* at 706.  *Miller* looked to the then-applicable 2011 Application Note 28 (now Note 17) to § 2D1.1, which provides:

(continued . . . )

But Breiner attests that "[g]iven the strength of the evidence, including Jeter's unprotected admissions, the government was not willing to . . . reconsider its position regarding the sentencing enhancements for leader/organizer and maintaining a stash house."  ECF No. 171-1 at PageID.1430.  "[Breiner] relayed these discussions to Jeter," who "ultimately decided that he did not wish to contest these issues and signed the Memorandum of Plea Agreement."  *Id.*  Similarly, as indicated above, Singh attests that he had in depth discussions with Jeter "about how his post-arrest admissions alone supported the sentencing enhancements for organizer/leader and stash house," ECF No. 171-2 at PageID.1442, and that Jeter did not want to contest the enhancements.  *Id.*

In the plea agreement—agreed to and stipulated by Jeter—Jeter admitted that "[o]nce the controlled substances arrived in Hawaii, Jeter stored them at a residence located on Uahanai Place in Kapolei, Hawaii, hereinafter referred to

---

Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises.  In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

*Miller*, 698 F.3d at 706 (quoting former Application Note 28).  Applying the current Note 17, as explained to follow, Jeter stipulated to facts that clearly establish that he maintained a stash house.

as the 'stash house.'"  ECF No. 89 at PageID.368.  The plea agreement also makes

several other references to the "stash house," and Jeter's use of it for drug

transactions.  *See id.* at PageID.371, 372.  And at the change-of-plea hearing, Jeter

agreed under oath with the government that "[a] two level increase applies because

the Defendant maintained a premises for the purposes of distributing controlled

substances."  ECF No. 170 at PageID.1364.  He agreed with the government that

"[o]nce the controlled substances arrived in Hawaii, Jeter stored them at a

residence located at Uahanai Place in Kapolei, Hawaii . . . referred to as the stash

house."  *Id.* at PageID.1371.  And Jeter told the court in his own words that he was

guilty of the conspiracy because "I acquired the drugs from Mexico, got them to

Hawaii, put them away in a stash house, and distributed them to David Monalim

and Janet Pauline Nelson."  *Id.* at PageID.1376.[14]

      As with Jeter's other claims, these admissions under oath are fatal to

his claim that either counsel was ineffective for failing to challenge a stash house

enhancement.  *See Blackledge*, 431 U.S. at 65; *Ross*, 511 F.3d at 1236; *White*, 366

F.3d at 297; and *Muth*, 676 F.3d at 821–22.  Given the record, no evidentiary

hearing is necessary on this question.  *See, e.g.*, *Mejia-Mesa*, 153 F.3d at 929.

---

[14]  *Cf. United States v. Ponce-Ulloa*, 835 F. App'x 227, 230 (9th Cir. 2020) (mem.)
(upholding application of stash house enhancement where defendant simply testified that he had
a stash house).

c.    Firearm "enhancement"

Jeter also challenges counsel's failure "to challenge the firearm enhancement under U.S.S.G. § 2D1.1(b)(18) in connection with the 18 U.S.C. § 924(c) charge, despite factual and legal grounds to contest whether the firearm was possessed or used in furtherance of a drug trafficking crime."  ECF No. 174 at PageID.1496.  As with the other two enhancements, the claim plainly fails.

To start, Jeter did not receive a sentencing enhancement for possession of firearms, rather he pled guilty to a charge under 18 U.S.C. § 924(c).  *See* ECF No. 171 at PageID.1417.  The court construes this claim as more generally challenging counsel's alleged failure to investigate or contest the § 924(c) charge.

In the plea agreement, Jeter admitted and stipulated that "he possessed the recovered Taurus revolver, Ruger pistol, and ammunition in furtherance of his drug trafficking during the conspiracy, to protect against assault, robbery, and theft of his controlled substances and proceeds."  ECF No. 136 at PageID.1031.  At the change-of-plea hearing, Jeter agreed under oath with the government's statements that:

> During the period of the conspiracy and in furtherance of his drug trafficking, Jeter knowingly and intentionally possessed a Taurus .38 caliber revolver bearing serial number QF84836, a Ruger 9 millimeter caliber pistol bearing serial number 313-71342 and approximately 424 rounds of assorted ammunition to include 403 rounds of 9 millimeter ammunition, 17 rounds of .38 caliber

36

ammunition, and 2 rounds of .25 caliber ammunition, and
2 rounds of .22 caliber ammunition.  The firearms and
ammunition were owned by Jeter and stored by Jeter at
the stash house in a safe along with controlled
substances.

Jeter possessed these firearms and ammunition in
furtherance of the charged drug trafficking conspiracy,
including for protection against assault and protection
against robbery and theft of his controlled substances and
proceeds.

ECF No. 170 at PageID.1373–1374; *see also id.* at PageID.1376 (agreeing with the

government's summary).

And at that hearing, in his own words while under oath, Jeter admitted

to possession of firearms in furtherance of the drug conspiracy, as follows:

THE COURT:   As it relates to Count 8, and I believe, looking at
paragraph eight of the plea agreement beginning on
page 11, you did possess the firearms and ammunition
at issue in the case?

THE DEFENDANT:  I did possess those, Your Honor.

THE COURT:  Okay.  That includes the Taurus revolver, the Ruger
pistol, and the various rounds of ammunition
discussed therein?

THE DEFENDANT: Yes, sir.

THE COURT:  Okay.  And you did that in furtherance of the drug
conspiracy, specifically to protect yourself, to protect
the dope, to protect theft or robbery of the drugs?

THE DEFENDANT:  It could be perceived that way.

THE COURT:  It needs to be more than perceived that way.  That's what we're pleading guilty to today, and that's one of the elements.  You want a chance to talk to Mr. Singh about it?  You guys can be seated again.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  To review the question, you possessed these firearms and ammunition?

THE DEFENDANT:  I did.

THE COURT:  In furtherance of the drug trafficking conspiracy charged in Count 1?

THE DEFENDANT:  I did.

THE COURT:  Okay.  And that is, it was used for protection?

THE DEFENDANT:  It was.

THE COURT:  Protection against assault, protection against robbery, a protection against theft of the drugs.

THE DEFENDANT:  It was.

ECF No. 170 at PageID.1379–1380.[15]  Again, at that hearing, Jeter had agreed that

he was "satisfied with counsel and the advice he's given you in this case."  *Id.* at

---

[15]  Jeter argues that he equivocated (initially responding "it could be perceived that way"), and Singh was ineffective because he "offered no clarification or defense," and that "[t]his undermines the voluntariness of the plea . . . ."  ECF No. 175 at PageID.1506.  He thus argues that "Jeter's plea colloquy was marred by uncertainty and confusion regarding the firearm enhancement."  *Id.*  But this characterization fails when reading the entire colloquy in context. Magistrate Judge Porter told Jeter that "[i]t needs to be more than perceived that way."  ECF No. 170 at PageID.1379.  He asked him if he "want[ed] a chance to talk to Mr. Singh about it?"  *Id.* And after that, Jeter unequivocally agreed in his own words that he used firearms for protection against assault, robbery, and theft of the drugs.  *Id.* at PageID.1380.

PageID.1355–1356.  He agreed that he had had a chance "to discuss sufficiently with [his] attorney the allegations and the charges in [the] indictment."  *Id.* at PageID.1356.

As with Jeter's other claims, these admissions under oath are fatal to this claim that counsel was ineffective for failing to challenge the firearms charge. *See Blackledge,* 431 U.S. at 65; *Ross,* 511 F.3d at 1236; *White,* 366 F.3d at 297; and *Muth,* 676 F.3d at 821–22.  Given the record, no evidentiary hearing is necessary on this question.  *See, e.g.*, *Mejia-Mesa*, 153 F.3d at 929.

### d.    Failing to negotiate a favorable plea agreement

Next, Jeter argues generally that counsel was ineffective for failing to "[a]ttempt to negotiate a favorable plea agreement on [his] behalf."  ECF No. 174 at PageID.1496; ECF No. 166 at PageID.1305.  The claim plainly fails, however, because Breiner did in fact negotiate a plea agreement between Jeter and the government.  *See* ECF No. 89.  Breiner explains that he focused on Jeter's ability to cooperate with the government and to negotiate a plea agreement, given Jeter's post-*Miranda* admissions of guilt and evidence obtained from numerous search warrants, along with Breiner's in depth discussions with Jeter in which he had decided to take responsibility for his actions and had no desire to proceed to trial. *See* ECF No. 171-1 at PageID.1427.  Breiner describes his significant discussions with Jeter and with the government regarding a plea agreement.  *Id.* at

PageID.1429.  The record is replete with emails and documents back and forth with the government regarding negotiating the terms of a plea.  *See, e.g.*, ECF Nos. 171-5, 171-6, 171-7, 171-8, and 171-9.

The plea agreement resulted in the government dismissing five of the eight counts alleged against Jeter in the indictment.  *See* ECF No. 136 at PageID.1020; *see also* ECF No. 89 at PageID.362–363..  The government agreed that Jeter would receive downward adjustments for acceptance of responsibility and for entering a timely plea.  *See* ECF No. 170 at PageID.1364.  The plea agreement also contained a cooperation agreement, and in fact the government filed a motion for a downward departure under Guideline § 5K1.1 and 18 U.S.C. § 3553(e), ECF No. 155, which resulted in a reduced sentence.  *See* ECF No. 161 at PageID.1210, 1237–1238, 1243.[16]  At the change-of-plea hearing, Jeter reaffirmed his agreement, and acknowledged that counsel sufficiently discussed it with him.  *See* ECF No. 170 at PageID.1362.  He stated under oath that he agreed with its terms and entered the agreement with no one making any threats or promises other than those in the agreement.  *Id.* at PageID.1367, 1376.

---

[16]  As to Count One, the advisory Guidelines range was 324 to 405 months incarceration. Count Ten carried a maximum sentence of 240 months, so the Guidelines range was 240 months. Based in part on Jeter's cooperation, the court departed downward to a sentence of 180 months as to Counts One and Ten, to run concurrently.  With a mandatory consecutive 60-month sentence as to Count Eight, the court imposed a total sentence of 240 months.  *See* ECF No. 158 at PageID.1185; ECF No. 159; ECF No. 136 at PageID.1053.

Given this record, Jeter's claim that counsel did not attempt to negotiate a favorable plea agreement clearly fails.  Any dissatisfaction Jeter may now have regarding the plea agreement cannot have been the result of ineffective assistance; Jeter offers no specific evidence that counsel could have negotiated a more favorable plea agreement.  Under *Strickland*, counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," 466 U.S. at 690, and thus the court finds no reason to find counsel ineffective in negotiating Jeter's plea agreement. *See id.* at 690–91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").  And Jeter has not demonstrated any probability that but for counsel's errors in negotiating a plea, he would not have pled guilty. *See Frye*, 566 U.S. at 148 ("In cases where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'") (quoting *Hill*, 474 U.S. at 59).  As reasoned earlier, Jeter did not attest that he would have insisted on proceeding to trial, but even if he did, there is no "contemporaneous evidence to

41

substantiate" such an assertion.  *Lee*, 582 U.S. at 369; *see also Rodriguez*, 49 F.4th at 1214 ("[W]e are limited to evidence contemporaneous to the guilty plea.").

> **4.    *Sentencing Counsel's Failure to Adequately Discuss and Explain the PSR Prior to Sentencing***

Next, Jeter attests generally that his "sentencing counsel [Singh] fail[ed] to adequately discuss and explain the [PSR] to me prior to the sentencing hearing, leaving me unaware of key facts, guideline calculations, and enhancements."  ECF No. 174 at PageID.1497; *see also* ECF No. 166-1 at PageID.1334.  But he offers no specific "key facts, guideline calculations, and enhancements," that he is now aware of that would have made a difference in his sentence.  And, similarly, he has no evidence of what discussion would have been "adequate" to constitute effective representation by resulting in a more favorable sentence.

In contrast, Singh explains in detail that he met with Jeter along with the U.S. Probation Officer on April 26, 2023, for a presentence review, where Jeter "acknowledged making statements to the Government and cooperating on other cases."  ECF No. 171-2 at PageID.1444.  Singh recounts that he met with Jeter after the June 14, 2023 draft PSR was issued and provided that draft PSR to him, and, after discussion, Jeter had no substantive objections.  *Id.*  After that meeting, Singh filed 50 character letters, 23 exhibits, a sentencing statement with a motion

for downward departure and variance, and a psychiatric report. *Id.* Singh further attests:

> On September 19, 2023, the PSR(l) (ECF No. 125) was issued and on December 28, 2023, the PSR(2) (ECF No. 136) was issued. I reviewed and discussed these PSRs with Jeter prior to his sentencing. I further advised Jeter as to what he could expect to happen at his sentencing hearing. We discussed that Jeter would prepare a statement and that he would speak to the court at his sentencing.

*Id.* at PageID.1445. And at the sentencing hearing, the court began with the following colloquy:

> THE COURT:  All right. So let me start with you, Mr. Singh and Mr. Jeter, and ask both of you if you've had a full and fair opportunity to read, review, and discuss the presentence report and to file any objections, whether factual or legal, in writing.
>
> MR. SINGH:  We have, Your Honor. Thank you.
>
> THE COURT:  Is that right, sir?
>
> THE DEFENDANT:  I have, Your Honor.

ECF No. 161, at PageID.1208.

Given this record, the court concludes—without an evidentiary hearing—that Jeter cannot demonstrate ineffective assistance of counsel for Singh's failure to "adequately" meet with him regarding the PSR (either draft or final versions). Jeter has presented no specific evidence of a deficient performance

by Singh.  *See Blackledge*, 431 U.S. at 74 ("[P]resentation of conclusory

allegations unsupported by specifics is subject to summary dismissal. . . .").  He

has also presented no evidence (much less a specific argument) of how he was

prejudiced by the alleged failure to discuss the PSR.  And he has not shown that

Singh failed to investigate any other aspect of his record contained in the PSR.  *See*

*Babbit*, 151 F.3d. at 1173 ("While a lawyer is under a duty to make reasonable

investigations, a lawyer may make a reasonable decision that particular

investigations are unnecessary.").  That is, as to this claim, "the files and records

conclusively show that the movant is not entitled to relief."  *Mejia-Mesa*, 153 F.3d

at 929.

> **5.** **_Sentencing Counsel's Alleged Failure File Objections to the PSR_**
> **_and Failure to Argue for Mitigation of Punishment and Object to a_**
> **_Substantively Unreasonable Sentence_**

Jeter also attests generally that Singh "[f]ail[ed] to file substantive

objections to the PSR, including challenges to enhancements and factual

inaccuracies that increased my sentencing exposure," and "[f]ailed to argue for

mitigation of my sentence or to object to my sentence as being substantively

unreasonable . . . ."  ECF No. 174 at PageID.1497.  These arguments have no basis

in fact.

To the extent these arguments concern the leader/organizer and stash

house enhancements, they fail for the reasons discussed previously (i.e., lack of

evidence, contradictions with Jeter's statements in his plea agreement and under oath at the change-of-plea hearing). And Jeter points to no other "factual inaccuracies" that could have "increased [his] sentencing exposure." Again, Jeter had admitted to his crimes to the FBI after waiving his *Miranda* rights. There was no basis to challenge the FBI's search warrants, which led to ample incriminating evidence. Jeter admitted to all the elements of the relevant crimes both in his plea agreement and under oath at the change-of-plea hearing. If Singh did not file specific objections to the PSR, it was because he had no basis to do so, and Jeter agreed not to do so after discussing the evidence with Singh.

Jeter argues that Singh failed to advocate for mitigation "despite [facts] document[ed] in a psychological evaluation by a mental heath professional." ECF No. 166-1 at PageID.1336. He further argues that his record "further supported a below-guideline sentence" and that "Singh did not advocate for a downward variance or object to the sentence as excessive." *Id.*

But Singh in fact did make extensive arguments for mitigation. As explained above, he obtained and filed 50 character letters, 23 exhibits, and a sentencing statement which sought a downward departure and variance. ECF No. 171-2 at PageID.1444; ECF Nos. 121-1 through 121-50; ECF Nos. 122-1 through 122-23. And as part of Singh's filings, Singh presented the evaluation from psychiatrist Martin Blinder (which had been initiated previously by Breiner). *See*

ECF No. 123-1 (Blinder evaluation).  The statement argued the factors set forth in

18 U.S.C. § 3553(a), and sought a sentence below the guideline range.  *See* ECF

No. 123 at PageID.706.  Singh recounted relevant aspects of Jeter's life and

upbringing, including traumatic events throughout his life.  *See id.* at PageID.709.

Singh's arguments were supported by the Blinder evaluation.  *See* ECF No. 123-1

at PageID.719.  At the sentencing hearing, Singh expanded on his arguments and

asked for a sentence of between 120 to 180 months.  *See* ECF No. 161 at

PageID.1212.  And, indeed, as noted earlier, the court departed below the guideline

range, sentencing Jeter to 240 months of incarceration (varying downward from a

guideline range of 324 to 405 months to 180 months as to Count One).  *See* ECF

No. 158 at PageID.1185; ECF No. 159 at PageID.1196–1197; ECF No. 161 at

PageID.1233, 1243.

Given Singh's arguments in mitigation, and the court's sentence below

the advisory guideline range, the court concludes that Singh was not ineffective for

failing to argue for mitigation of Jeter's sentence or to object to the sentence as

being substantively unreasonable.  The court considered the guidelines and all the

§ 3553(a) factors in concluding that the below-guidelines sentence of 240 months

was appropriate.  Singh had no reason to argue the sentence was substantively

unreasonable, and his failure to do so was not prejudicial.  *See, e.g.*, *United States*

*v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) ("In determining substantive

reasonableness, [courts] are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range.") (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)) (en banc).

### 6.    *Sentencing Counsel's Failure to File a Notice of Appeal*

Lastly, the court addresses Jeter's claim that Singh was ineffective in failing to file a notice of appeal from his sentence.  Specifically, Jeter attests that Singh "[f]ail[ed] to file a Notice of Appeal despite my request to do so, thereby depriving me of my statutory right to direct review and further violating my Sixth Amendment right to effective assistance of counsel."  ECF No. 174 at PageID.1497.  His claim is bolstered by a declaration from his wife, Andrea Jeter, attesting that "Gary Singh told me immediately following the sentencing of [Jeter] that he would obtain the transcript from the sentencing and file an appeal and that he had 14 days to do so."  ECF No. 177-1 at PageID.1512.  She declares that "[Singh] received the transcript and sent me an email telling me I needed to send $201.50 for the transcript and that his office paid for it already so just reimburse them.  He requested the transcript on May 21, 2024."  *Id.*  She continues:

> Courtney Jeter also told me that Gary Singh told him that
> he was eligible for appeal because the judge said he was
> going to go below the recommendation and went 6
> months over it.  There is no way Courtney could have
> known that without Gary telling him about it so he
> definitely thought the appeal was filed within the 14
> days.  He left Honolulu FDC immediately after his

47

> sentencing so he did not have any contact with Gary
> Singh after that but we both thought something was filed
> in May 2024. Courtney asked me to get a copy of the
> appeal Gary filed after he got to Lompoc and we found
> out in November 2024 that nothing was ever filed.

*Id.*

Singh, however, specifically denies that Jeter instructed him to appeal.

*See* ECF No. 171-2 at PageID.1446 ("Jeter never expressed a desire to appeal his

sentence, nor did he ask me to file a notice of appeal").  Singh explains:

> The last time I met with Jeter was on approximately
> 6/14/2024.  During this time, Jeter never once indicated
> that he wanted to appeal, nor did he ever ask me to file a
> notice of appeal.  Had Jeter asked me to file a notice of
> appeal on his behalf I absolutely would have.

*Id.*

The Sixth Amendment guarantees the right to effective assistance of

counsel at all critical stages of a criminal proceeding, including sentencing.  *See*

*Gonzalez*, 113 F.3d at 1029.  Further, the Sixth Amendment may be violated if

counsel fails to file a notice of appeal.  *Roe v. Flores-Ortega*, 528 U.S. 470, 477

(2000); *see also Garza v. Idaho*, 586 U.S. 232, 241 (2019) (holding that *Flores-*

*Ortega*'s presumption of prejudice applies despite an appeal waiver).  Here, there

is specific but conflicting evidence as to whether Jeter told Singh to appeal.

The Ninth Circuit addressed a similar situation in *Sandoval-Lopez*,

where the defendant entered into a plea agreement largely waiving his right to

appeal.  In a subsequent § 2255 motion, the defendant claimed that despite a

request, his counsel failed to file a notice of appeal.  Although recognizing the rule

it announced was "contrary to common sense," 409 F.3d at 1196, *Sandoval-Lopez*

held that the failure to file the appeal, even in the face of an appeal waiver, was

ineffective assistance of counsel:

> If, as Sandoval-Lopez claims, it is true that he explicitly
> told his lawyer to appeal his case and his lawyer refused,
> then we are required by *Flores-Ortega* to conclude that it
> was deficient performance not to appeal and that
> Sandoval-Lopez was prejudiced.  The prejudice in failure
> to file a notice of appeal cases is that the defendant lost
> his chance to file the appeal, not that he lost a favorable
> result that he would have obtained by appeal.

*Id.* at 1197.  That is, even assuming an appeal of a sentence would be meritless,

"prejudice" necessarily results just by losing the right to appeal.  *See also Garza*,

586 U.S. at 243–44 ("[W]e reaffirm that, 'when counsel's constitutionally deficient

performance deprives a defendant of an appeal that he otherwise would have taken,

the defendant has made out a successful ineffective assistance of counsel claim

entitling him to an appeal,' with no need for a 'further showing' of his claims'

merit . . . regardless of whether the defendant has signed an appeal waiver.")

(quoting *Flores-Ortega*, 528 U.S. at 484).

      *Sandoval-Lopez* further explained two options available in such a

situation:

> If a defendant, even one who has expressly waived his right to appeal, files a habeas petition after sentencing and judgment claiming that he ordered his attorney to appeal and his attorney refused to do so, two things can happen. The district court can hold an evidentiary hearing to decide whether petitioner's allegation is true, and if it is, vacate and reenter the judgment, allowing the appeal to proceed. Or, if the [government] does not object, the district court can vacate and reenter the judgment without a hearing and allow the appeal to proceed, assuming without deciding that the petitioner's claim is true.

*Id.* at 1198.

Thus, guided by *Sandoval-Lopez*, the court directs the United States to inform the court by October 14, 2025 if it (1) seeks an evidentiary hearing as to whether Jeter actually instructed Singh to file a notice of appeal and Singh failed to do so, or (2) elects not to oppose the § 2255 Motion solely on this remaining ground, and to instead permit Jeter to appeal. If the United States seeks an evidentiary hearing, the court will schedule an evidentiary hearing on that issue.

## V.  CERTIFICATE OF APPEALABILITY

The court has denied Jeter's § 2255 Motion as to all grounds except the claim that counsel was ineffective in failing to file a notice of appeal. The court thus addresses here whether Jeter should be granted a certificate of appealability ("COA") as to the four dismissed grounds. *See* R. 11 Governing Section 2255 Proceedings (providing that "[t]he district court must issue or deny a

certificate of appealability when it enters a final order adverse to the applicant"). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The standard for a certificate of appealability is lenient." *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc), *overruled on other grounds by Swarthout v. Cooke*, 562 U.S. 216 (2011). The petitioner is required to demonstrate only "that reasonable jurists could debate the district court's resolution or that the issues are adequate to deserve encouragement to proceed further." *Id*. (citation and internal quotation marks omitted). The standard "requires something more than the absence of frivolity but something less than a merits determination." *Id*. (internal quotation marks omitted).

The court carefully reviewed Jeter's assertions and gave him every benefit by liberally construing them. Based on the record and the analysis above, as to Jeter's ineffective assistance of counsel claims (other than, at least at this time, failure to file a notice of appeal), reasonable jurists could not find the court's rulings debatable. Accordingly, the court DENIES issuance of a COA as to these grounds.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, the court DENIES Jeter's § 2255 Motion in part, as to all grounds except for failure to file a notice of appeal. The court

DENIES a COA as to those grounds.  As to the claim alleging ineffective

assistance of counsel for failure to file an appeal, the United States is DIRECTED

to file a Response pursuant to *Sandoval-Lopez* by October 14, 2025.  Because the

§ 2255 Motion as a whole remains open, it is premature to enter judgment (even if

the court has denied relief on all but one ground).  The court will address the

remaining ground after reviewing the Government's Response.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 30, 2025.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge